FILED
2022 Mar-25  PM 04:12
U.S. DISTRICT COURT
N.D. OF ALABAMA

**UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION**

| | | |
|---|---|---|
| TRONDHEIM CAPITAL PARTNERS LP & MTP 401K PLAN, | ) ) ) | |
| Plaintiffs, and | ) ) | **CIVIL ACTION NO.** |
| MITCHELL PARTNERS, L.P., *et al.*, | ) ) | **4:19-cv-1413-KOB** |
| Plaintiffs in Intervention, | ) ) | |
| v. | ) ) | |
| LIFE INSURANCE COMPANY OF ALABAMA, *et al.*, | ) ) ) | |
| Defendants. | ) | |

**MEMORANDUM OPINION**

Plaintiffs filed this case in August 2019; Defendants have yet to answer. This delay arises largely from the original Plaintiffs' piecemeal pleadings, the intervention of additional Plaintiffs over six months later, a prior round of motions to dismiss, and the court's decision to stay the case for almost four months. Defendants have again moved to dismiss (doc. 57), and the court will please neither side by granting in part and denying in part that motion.

The Plaintiffs consist of several shareholders in the Life Insurance Company of Alabama (LICOA). They level direct and derivative claims against LICOA and six of its Directors. Plaintiffs allege *derivatively* that four of the Director Defendants devalued LICOA's stocks in an intentional effort to purchase shares for themselves at decreased values (Count 1); that three of the Director Defendants usurped LICOA's corporate opportunity by buying shares for themselves at reduced prices (Count 4); that all the Director Defendants usurped a corporate opportunity by failing to properly assess offers to buy out LICOA (Count 5); and that all the

Director Defendants engaged in corporate waste (Count 6). (Doc. 54 at 41 *et seq.*). In their *individual* capacity, Plaintiffs directly ask the court to dissolve LICOA as a corporation because of the Director Defendants' corporate waste (Count 2); and Plaintiffs Trondheim and MTP allege that all Defendants violated their shareholder rights by refusing to make corporate records available for inspection (Count 3). (Doc. 54 at 43 *et seq.*).

In December 2020, the court faced a flurry of documents, including amended direct and derivative complaints, motions to dismiss the two operative complaints, and a motion to abstain under the *Burford* doctrine. While encouraging the parties to "tidy up" the case by consolidating their pleadings and filings, the court granted the motion to dismiss in part, denied that motion in part, and stayed the case. (Docs. 49 & 50). The court dismissed without prejudice Plaintiffs' dissolution claim because it found that it must abstain from adjudicating that claim under the *Burford* abstention doctrine. (Doc. 49 at 27 *et seq.*). The court then stayed proceedings as to Plaintiffs' remaining claims for damages to permit Plaintiffs to file their dissolution claim in state court.

The stay lasted from December 2020 until March 2021, when the Eleventh Circuit issued an opinion indicating that the *Burford* doctrine did not apply to claims for dissolution. *See Deal v. Tugalo Gas Co., Inc.*, 991 F.3d 1313 (11th Cir. 2021). Based on *Deal*, the court withdrew its order insofar as the ruling relied on the *Burford* doctrine (doc. 51), and the court permitted Plaintiffs to file their current Third Amended Consolidated Complaint (doc. 53).

Thankfully, only one hiccup hampered this current round of motions. On May 3, 2021, Defendants filed their motion to dismiss Plaintiffs' third amended consolidated complain. (Doc. 57). Meanwhile, Defendants had hired the outside law firm of Lightfoot, Franklin, White, LLC to investigate Defendants' alleged wrongdoings. But Lightfoot was unable to conclude its

investigation and produce a memorandum describing their findings until May 14, 2021—eleven days after Defendants had filed the current motion to dismiss but before Plaintiffs had responded. (Doc. 61-1). Even so, Plaintiffs did not oppose Defendants' filing the Lightfoot memo into the court's docket, stating their preference that the court handle all challenges to the derivative claims "in one briefing swoop." (Doc. 62 at 2). The court permitted Defendants to file the second Lightfoot report and also granted Plaintiffs more time to respond. (Doc. 63). Plaintiffs responded both to the original motion and to Defendants' amendment, which included the Lightfoot report. (Doc. 65). Defendants replied (doc. 66), so the motion is ripe for review.

As explained below, the court finds that Defendants properly appointed independent directors to investigate Plaintiffs' derivative claims, and that LICOA properly rejected those claims. So the court will dismiss Plaintiffs' derivative claims in deference to LICOA's business judgment. *See Roberts v. Alabama Power Co.*, 404 So. 2d 629, 632 (Ala. 1981) (holding that, under the business judgment rule, courts must respect a corporation's decision made "in good faith and after a thorough investigation" to reject a shareholder-plaintiffs derivative claims). Alternatively, the court finds that Defendants' conduct did not toll the statute of limitations as to Plaintiffs' derivative claims. So if the court were not dismissing the derivative claims under the business judgment rule, it would dismiss all derivative claims arising from factual bases occurring earlier than two years before Plaintiffs' complaint. But the court rejects Defendants' argument as to the direct individual claims. So the court will deny Defendants' motion to dismiss the claims that Plaintiffs state in their individual capacities.

## EVIDENTIARY MATERIALS UNDER SUBMISSION

Plaintiffs and Defendants present significantly more factual material than is typically presented at the motion to dismiss stage. When considering a motion to dismiss, courts usually

only consider the complaint, documents attached to the complaint, and documents incorporated by reference in the complaint. *Financial Sec. Assur., Inc. v. Stephens, Inc.*, 500 F.3d 1276, 1284 (11th Cir. 2007). But the accepted procedure is for defendants to move to dismiss shareholder derivative claims when the defendants have investigated and rejected those claims in good faith and after a thorough investigation. *See Deal v. Tugalo Gas Co., Inc.*, 991 F.3d 1313, 1319 (11th Cir. 2021) (affirming lower court's dismissal of derivative claims after corporation's proper rejection and motion to dismiss); *Kaplan v. Wyatt*, 484 A.2d 501, 507 (Del. Ch. 1984), *aff'd*, 499 A.2d 1184 (Del. 1985).

Courts recognize that such a motion to dismiss and its supporting evidence "finds no ready pigeonhole" in the rules of civil procedure. *Zapata Corp. v. Maldonado*, 430 A.2d 779, 787 (Del. 1981). Because the court must assess the corporation's investigation into the plaintiff's derivative claims, courts often consider documents beyond the scope of a typical 12(b)(6) ruling. *See Deal*, 991 F.3d at 1321 (affirming dismissal of derivative claims based on analysis of corporation's investigation report). These documents can include "a thorough written record of the investigation and its findings and recommendations," and any supporting "affidavits and/or verified documents." *Kaplan*, 484 A.2d at 507.

As the court will explain below, Plaintiffs attached numerous exhibits to their complaint as a result of their pre-suit investigation of LICOA's alleged wrongdoings. Because Plaintiffs attached those documents to the complaint, the court will consider them under the traditional 12(b)(6) framework. *See Financial Sec. Assur., Inc.*, 500 F.3d at 1284 (permitting courts to consider documents incorporated by reference in the complaint at the 12(b)(6) stage).

Also, Defendants hired the outside law firm of Lightfoot, Franklin, White, LLC to investigate Plaintiffs' claims regarding Defendants' alleged wrongdoings. Lightfoot produced

4

two memoranda reflecting its investigation into Plaintiffs' derivative claims, which Defendants filed as exhibits to this motion. (Doc. 57-1; doc. 64-1). Plaintiffs' operative complaint heavily criticizes the first of these memoranda by specifically referring to its pages and findings. (Doc. 54 at 31 *et seq.*). Because of these references, the court will also consider the first Lightfoot memorandum under the traditional 12(b)(6) framework.

But Plaintiffs' complaint does not discuss the second Lightfoot memorandum because Lightfoot did not conduct the second portion of its investigation until after Plaintiffs filed their current complaint. Even so, Plaintiffs did not oppose Defendants' filing the second Lightfoot memo into the record for this motion. (Doc. 62). And the memo falls within the type of documents that courts routinely consider in assessing motions to dismiss derivative claims based on a good faith investigation. *See Deal*, 991 F.3d at 1321 (considering investigation report); *Kaplan*, 484 A.2d at 507 (same). So the court properly can consider the second Lightfoot report, which Plaintiffs had an opportunity to rebut in their response brief, as it considers the motion to dismiss.

## **FACTS**

### I.   **Plaintiffs' Original Claims**

In May 2018, Colin Peterson, Plaintiff Trondheim's principal, met with Clarence Daugette and Steve Keck to discuss Peterson's misgivings with the company's management. (Doc. 54 at 10). Daugette is LICOA's president and board chairman, and Keck is LICOA's chief operating officer. Peterson shared his concerns that LICOA's non-voting shares "were trading at a greater than 50% discount to the tangible book value of the shares." (*Id.*). In the meeting, Daugette allegedly admitted that "he did not mind the fact that LICOA is overcapitalized and the

stock is cheap because it allows him and his family to buy back the stock at a good price personally." (Doc. 54 at 11).

Daugette's admission led Plaintiffs to investigate further. Plaintiffs first consulted a report of the Alabama Department of Insurance's examination of LICOA, published in 2005. Plaintiffs attached the report to their complaint, and it details "highly unusual" internal practices, including that directors who also served as officers received compensation for both roles. (Doc. 54-1 at 3). The report also found that LICOA improperly financed personal expenses for directors and officers, many of whom were related as family. And the report noted an overly generous employment contract for Rosalie Causey, who the Department of Insurance found to be underqualified and whose parents are both Director-Defendants in this case. (Doc. 54 at 12). Causey allegedly continues to abdicate her fiduciary duties to LICOA in favor of her "lavish lifestyle of global travel and extravagance." (Doc. 54 at 15–16). For example, the body of Plaintiffs' complaint includes a copy of a 2013 social media post by Causey's husband showing a picture of a beach and captioned "view from the office!" (*Id.*).

In their investigation of wasteful compensation practices, Plaintiffs also uncovered LICOA's internal audits from 2012, December 2014, and December 2017 allegedly showing that LICOA improperly reimbursed the Director Defendants for meals, golf games, clothes, spa appointments, and other personal items. (Doc. 54 at 17). And in 2016, one of Plaintiffs' key informants, Terry Silvey, allegedly observed that the Director Defendants routinely showed up late to work and worked short hours. (Doc. 54 at 20). Plaintiffs also allege that LICOA's office renovations in 2019 included excessively lavish items for the Director Defendants, such as a $4,787 office chair for Daugette. (Doc. 54 at 18; doc. 54-6).

As to Defendants' salaries, Plaintiffs allege that Defendants Daugette, Lowe, Renfrow, and Causey earn nearly identical salaries—proof that "LICOA's compensation is not based on the market value of services rendered, but rather it is a *de facto* family dividend." (Doc. 54 at 16). LICOA paid these directors annual salaries between $326,000 and $360,000 each over the last three years. (Doc. 54-18). Plaintiffs allege that LICOA paid these salaries without written records and for "'no show' or 'no work' jobs." (Doc. 54 at 20). Specifically, Plaintiffs argue that Rosalie Causey, who is now LICOA's vice president, would not receive an equivalent salary from any other employer. (Doc. 65 at 26 n.6).

Plaintiffs also allege that Defendants usurped a corporate opportunity by depressing share prices and purchasing shares for themselves and their families at reduced values. (Doc. 54 at 14). Plaintiffs allege that the Director Defendants purchase shares off-the-record and in a manner that prevents sellers both from knowing the "book value" price of shares and from negotiating for better prices. (Doc. 54 at 10). For example, Plaintiffs attached to their complaint records showing that Daugette personally purchased over 350 shares in small transactions from individual shareholders in 2020 at values as low as $10–15 per share. (Doc. 54-10). Meanwhile, Plaintiffs attached records showing that in the same year, LICOA's board voted to purchase nearly 7,000 shares from the "Jacobs family" at a price around $31 per share. (Doc. 54-9 at 2). Plaintiffs point to Daugette's 2020 purchase of shares at $10–15 and LICOA's 2020 purchase of shares at $31 to show that Daugette usurped LICOA's corporate opportunity to purchase shares at lower costs. And Plaintiffs allege that the Jacobs family shared many grievances in common with Plaintiffs regarding LICOA's mismanagement. (Doc. 54 at 24).

## II.   __Plaintiffs' Request for Records__

After the May 2018 meeting between Daugette and Peterson, Plaintiffs requested LICOA's business records under their shareholder rights pursuant to Ala. Code § 10A–2– 16.02(b). (Doc. 54 at 21). LICOA delayed providing any documents until approximately five months later. (Doc. 54 at 23). When Defendants previously moved to dismiss, this court ruled that Plaintiffs plausibly alleged that LICOA refused to allow Plaintiffs to inspect its records, in violation of § 16.02. (Doc. 49 at 23). And the court found the motion to dismiss stage was not the proper time to consider Defendants' affirmative defense that they had "reasonable cause" to refuse Plaintiffs' records request. (*Id.* at 26).

Although LICOA ultimately produced some records for inspection, Plaintiffs now allege that production contained "implausibly large gaps." (Doc. 54 at 29). For example, Daugette allegedly admitted that investors had made offers to buy LICOA outright in the past. (Doc. 54 at 22). But LICOA produced no documents mentioning these offers. Plaintiffs argue that the absence of documents reveals an uninformed decision not to pursue buyout. (*Id.*). Also, Plaintiffs claim that LICOA failed to properly consider methods for returning capital to shareholders; allegedly, Steve Keck told Colin Peterson that LICOA was considering such measures. (Doc. 54 at 27). But again, LICOA provided no documents showing that such discussions occurred, besides board minutes from 2015 stating that the board was considering a stock buyback plan. (Doc. 54-7 at 8). And as to Defendants' allegedly wasteful compensation, Plaintiffs point to an absence of documents describing the deliberations of LICOA's compensation committee. (Doc. 54 at 25).

III.      **Directors Smith and Cobb and the Lightfoot Investigations**

After Plaintiffs filed their first complaint in this action, Plaintiffs sent a letter to LICOA's board in September 2019. The letter demanded that LICOA "investigate all circumstances surrounding" its complaint and to "take appropriate action." (Doc. 54-16 at 2–3). The letter outlined Plaintiffs' claims at that time and included copies of the original complaint, portions of the 2005 Alabama Department of Insurance report, and other prior communications between Plaintiffs and LICOA.

In response to Plaintiffs' demand letter, LICOA's board appointed a "Special Litigation Committee" comprised of two directors—Gerald Smith and Herman Cobb—to investigate Plaintiffs' claims. (Doc. 54 at 31). Smith and Cobb already served as directors on LICOA's board, but they were not defendants in this case. In turn, Smith and Cobb hired the outside law firm of Lightfoot, Franklin & White, LLC to investigate Plaintiffs' claims and report their findings in a memorandum. Plaintiffs now allege that Directors Smith and Cobb lacked independence because they "are cut in on the excessive travel, meals, retreats, and other perks" that LICOA's directors receive. (Doc. 54 at 21).

The Lightfoot firm conducted two investigations into Plaintiffs' claims, and Defendants attached memoranda reflecting both investigations as exhibits to their current motion to dismiss. (Doc. 57-1; doc. 64-1). Lightfoot produced the first memo on November 11, 2019. (Doc. 57-1). At that time, Plaintiffs' operative complaint—the First Amended Complaint—stated no derivative claims. (Doc. 14). Despite the absence of claims styled as "derivative," Lightfoot's report stated that "LICOA believed that the Lawsuit included claims or causes of action belonging to LICOA and not to the plaintiffs." (Doc. 57-1 at 2). The report totaled roughly ten pages, single-spaced. In it, Lightfoot discussed its summation of Plaintiffs' claims, its review of

dozens of documents related to the claims, and its interviews with six of LICOA's directors. Lightfoot ultimately concluded that any alleged wrongdoings had no support in the record, that they arose from actions outside the statute of limitations, or that they represented valid exercises of LICOA's business judgment. (Doc. 57-1 at 10). Based on the Lightfoot report, Directors Smith and Cobb recommended that the board reject Plaintiffs' claims and not take action on behalf of LICOA. (Doc. 54 at 33).

The court then briefly stayed the case on *Burford* abstention grounds. (Doc. 50). After the court lifted the stay, Plaintiffs filed their current complaint in April 2021. (Doc. 54). In response, LICOA again called on Directors Smith and Cobb to investigate Plaintiffs' claims, and Smith and Cobb again relied on the Lightfoot firm. Lightfoot produced its second report, which again recommended not pursuing Plaintiffs' claims. (Doc. 64-1 at 26).

The second Lightfoot memo totals twenty-nine pages, single-spaced. Lightfoot considered even more documents for this report, including records of Clarence Daugette and other directors' personal stock purchases over the past four years; LICOA's annual financial statements for the past ten years; correspondence between Plaintiffs and Defendants discussing Plaintiffs' claims; LICOA's policies for director travel, expense, and reimbursement; LICOA's officer and director compensation records; several Alabama Department of Insurance reports on LICOA's affairs; and documentation of the identity and percentage ownership of shareholders. (Doc. Doc. 64-1 at 6, 12). And Lightfoot interviewed a total of ten witnesses, interviewing five of them twice in response to Plaintiffs' updated complaint. (*Id.* at 16 *et seq.*). Lightfoot again concluded that pursuing Plaintiffs' claims was not in LICOA's best interest because the cost of litigating those claims outweighed the benefits, given the viability of statute of limitations and business judgment defenses. (*Id.* at 26).

10

Directors Smith and Cobb reviewed the Lightfoot report and recommended to LICOA's board that LICOA not pursue Plaintiffs' claims. (Doc. 64 at 2). The LICOA board voted unanimously to adopt Smith and Cobb's recommendation and reject Plaintiffs' claims.

**LEGAL STANDARD**

Defendants move to dismiss all of Plaintiffs' claims under Federal Rule of Civil Procedure 12(b)(6), and they also move to dismiss Plaintiffs' derivative claims out of deference to the business judgment of LICOA's board to reject those claims.

### I.      The Motion to Dismiss Standard

Under Rule 12(b)(6), a defendant may challenge whether a plaintiff has "stated a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). To be plausible on its face, a claim must contain enough facts to "allow[] the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678. In other words, the complaint must demonstrate "more than a sheer possibility that a defendant has acted unlawfully." *Id.* The court may consider documents attached to the complaint and incorporated by reference in the complaint on a motion to dismiss. *Financial Sec. Assur., Inc.*, 500 F.3d at 1284.

The Supreme Court has identified "two working principles" for district courts to use when considering a motion to dismiss. First, the court must assume the veracity of the well-pleaded factual allegations. *Iqbal*, 556 U.S. at 678. But the court need not accept legal conclusions as true; "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.* Second, district courts are to draw upon their "judicial

11

experience and common sense" to determine if the complaint states a plausible claim. *Iqbal*, 556 U.S. at 679. The court must be able to "infer more than the mere possibility of misconduct." *Id*. If the court determines that well-pleaded facts, accepted as true, do not state a claim that is plausible, the claim must be dismissed. *Id.*

## II.    The Demand-Rejection and Business Judgment Rule Standard

Alabama law provides that the board of directors manages the business and affairs of a corporation. *See* Ala. Code § 10A–2–8.01.[1] And under the business judgment rule, courts should not interfere with directors' decisions regarding corporate affairs when the directors make those decisions in good faith, upon a reasonable basis, and resulting from independent judgment. *See Roberts v. Alabama Power Co.*, 404 So. 2d 629, 631 (Ala. 1981).

In *Roberts*, the Alabama Supreme Court held that the business judgment rule could apply to a corporation's decision to reject a derivative plaintiff's claims and terminate a shareholder derivative suit. 404 So. 2d at 631. As in this case, directors commonly appoint an independent special litigation committee to decide whether to pursue or dismiss the shareholder's claims. *See Roberts*, 404 So. 2d at 632; *Zapata Corp. v. Maldonado*, 430 A.2d 779 (Del. 1981). The analysis in *Roberts* provides the framework for interpreting an independent litigation committee's recommendation to reject a plaintiff's derivative claims:

> Upon finding that a special committee of disinterested directors has determined in good faith and after a thorough investigation that it is not in the company's best interests to allow an action to proceed, the business judgment rule would not allow the courts to interfere with the committee's determination.

*Roberts*, 404 So. 2d at 632 (citing *Genzer v. Cunningham*, 498 F. Supp. 682 (E.D. Mich. 1980)).

[1] The law of the state of the business's incorporation governs the process for bringing derivative suits. *See Deal v. Tugalo Gas Co., Inc.*, 991 F.3d 1313, 1319 (11th Cir. 2021). Alabama law governs this case because LICOA is incorporated in Alabama.

As the Eleventh Circuit later explained, the court's "job isn't to evaluate whether the [committee] was *correct* to recommend against a derivative action, but simply to determine whether the [committee] had a valid *process* for deciding whether or not to do so." *Deal v. Tugalo Gas Co.*, 991 F.3d 1313, 1319 (11th Cir. 2021) (interpreting Georgia and Delaware law) (emphasis in original).

And courts often consider documentary evidence of the independent directors' investigation of the plaintiff's derivative claims to assess the investigation's adequacy. *See Deal*, 991 F.3d at 1321; *Kaplan*, 484 A.2d at 507.

## DISCUSSION

The court will first address LICOA's challenges to Plaintiffs' derivative claims; then the court will turn to the direct claims that Plaintiffs state in their individual capacity.

### I.   Plaintiffs' Derivative Claims

Plaintiffs derivatively state claims for shareholder devaluation (count 1), usurpation of corporate opportunity via share repurchase (count 4), usurpation of corporate opportunity via buy-out (count 5), and waste (count 6). (Doc. 54). LICOA first moves to dismiss these derivative claims by arguing that Plaintiffs lack standing to sue under Alabama Code § 10A–2A–7.42. LICOA then argues that the decision of its independent directors to dismiss Plaintiffs' derivative claims requires the dismissal of Plaintiffs' claims. And LICOA argues that the statute of limitations for Plaintiffs' derivative claims expired before they filed those claims.

As explained below, the court agrees that it should dismiss Plaintiffs' derivative claims based on the LICOA board's business judgment in rejecting Plaintiffs' demand as to those claims. Alternatively, the court finds that the statute of limitations bars Plaintiffs' derivative claims arising from facts before August 28, 2017. Because the court finds these alternative

13

grounds require dismissal, the court will not address Defendants' other challenges to the derivative claims.

But first, the court must resolve the "antecedent question" of whether Plaintiffs have standing to sue because the court cannot rule on the merits if it only possesses "hypothetical jurisdiction" over the parties. *See Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 101 (1998). So the court begins with standing.

### a.  *Plaintiffs' Standing Under Alabama Code § 10A–2A–7.42*

Defendants argue that Plaintiffs do not have standing to assert their derivative claims on behalf of LICOA because a goal of their individual claims—LICOA's dissolution—conflicts with LICOA's corporate interests. (Doc. 57 at 10).

The Alabama Code provides: "A stockholder may commence or maintain a derivative action in the right of the corporation only if the stockholder fairly and adequately represents the interests of the corporation in enforcing the right of the corporation." Ala. Code § 10A–2A–7.42(1). Defendants argue that Section 7.42 "effectively bars" a plaintiff from stating both derivative claims *and* an individual claim for dissolution because a plaintiff seeking the corporation's dissolution in its individual claims cannot "fairly and adequately represent" the corporation's interests. (Doc. 57 at 11). In other words, Defendants argue that Plaintiffs' joining their derivative claims with their individual claim for dissolution in the same suit renders Plaintiffs unable to fairly and adequately represent LICOA's interests.

Because Section 7.42 has only been in effect since January 1, 2020, the court has found no case law interpreting its contours. But the provision resembles the much-interpreted language of the Alabama Rules of Civil Procedure, which require that the plaintiff "fairly and adequately represent the interests *of the shareholders* or members similarly situated in enforcing the right of

the corporation." Ala. R. Civ. P. 23.1 (emphasis added).[2] The key difference is that Section 7.42 requires plaintiffs to represent the interests "of the corporation," while Alabama's Rule 23.1 requires plaintiffs to represent the interest "of the shareholders." Defendants make much of this difference, arguing that Plaintiffs may not join their derivative claims with the individual dissolution claim because the dissolution claim contravenes the interests *of LICOA*, as distinct from its shareholders. (Doc. 57 at 11).

But the court finds this difference to have little practical effect. Derivative actions rest on the theory that the plaintiff "sues, not for himself alone, but as *representative of a class* comprising all who are similarly situated." *Cohen v. Beneficial Indus. Loan Corp*., 337 U.S. 541, 549 (1949) (emphasis added). Both the Alabama and Federal Rules of Civil Procedure reflect this principle by treating the derivative plaintiff as a representative for the shareholders, who are enforcing the rights of the corporation. *See* Ala. R. Civ. P. 23.1; Fed. R. Civ. P. 23.1(a). Indeed, the corporation's interests and the shareholders' interests effectively merge in the derivative context because the plaintiff represents all shareholders who suffered injuries "derived from those of the corporation." *Galbreath v. Scott*, 433 So. 2d 454, 457 (Ala. 1983).

Alabama's standing provision reflects this intertwining of corporate and shareholder interests. Section 7.42 requires that plaintiffs "represen[t] the interests of the corporation *in enforcing the right of the corporation*." Ala. Code § 10A–2A–7.42(1). The derivative plaintiff enforces the rights of the corporation by suing for injuries that "fall directly on the corporation." *Ex parte 4tdd.com, Inc.*, 306 So. 3d 8, 20 (Ala. 2020) (citation omitted). But such efforts also

---

[2] In general, the Federal Rules of Civil Procedure govern this federal action. *See Royalty Network, Inc. v. Harris*, 756 F.3d 1351, 1357 (11th Cor. 2014). And Defendants challenge Plaintiffs' standing under Ala. Code § 10A–2A–7.42(1), rather than the rules of civil procedure. But the court refers to cases interpreting the Alabama Rules of Civil Procedure because, as explained, the language of Alabama's Rule 23.1 resembles the statutory language at issue. So the court finds rulings by Alabama courts concerning Alabama's Rule 23.1 instructive as to the similar language of Section 7.42.

serve the overlapping interests of all injured shareholders, who "benefit indirectly by virtue of their ownership in the corporation." *Robbins v. Sanders*, 890 So. 2d 998, 1014 (Ala. 2004).

So in the absence of authority interpreting adequate representation of the *corporation's* interests under Section 7.42, the court will consider case law addressing adequate representation of *shareholders'* interests under Rule 23.1. In *Elgin v. Alfa Corporation*, the Alabama Supreme Court identified factors for assessing adequate representation including

> economic antagonisms between representative and class; the remedy sought by plaintiff in the derivative action; indications that the named plaintiff was not the driving force behind the litigation; plaintiff's unfamiliarity with the litigation; other litigation pending between the plaintiff and defendants; the relative magnitude of plaintiff's personal interests as compared to his interest in the derivative action itself; plaintiff's vindictiveness toward the defendants; and, finally, the degree of support plaintiff was receiving from the shareholders he purported to represent.

598 So. 2d 807, 819 (Ala. 1992) (quoting *Rothenberg v. Sec. Mgmt. Co.*, 667 F.2d 958, 961 (11th Cir. 1982) (interpreting Fed. R. Civ. P. 23.1(a)). The Supreme Court summarized the factors as follows: "A plaintiff is not disqualified under Rule 23.1 merely because of the existence of interests beyond those of the class he seeks to represent so long as he shares a common interest in the subject matter of the suit." *Elgin*, 598 So. 2d at 819 (quoting *G.A. Enterprises, Inc. v. Leisure Living Cmtys., Inc.*, 517 F.2d 24, 27 (1st Cir. 1975)).

Here, Defendants argue that Plaintiffs' "primary interest" is "the liquidation of their shares and individual gain from the 'Inspection Claim.'" (Doc. 57 at 11). But Plaintiffs seek to represent a class of shareholders who suffer injuries from the Director Defendants' alleged mismanagement of the corporation. So the key inquiry is whether Plaintiffs share with the shareholders and LICOA "a common interest in the subject matter of the suit." *See Elgin*, 598 So. 2d at 819. The general subject matter of this suit is the Director Defendants' alleged corporate waste, and Plaintiffs have a common interest—both with other shareholders and with

16

LICOA itself—in curbing that waste. Defendants have not shown how Plaintiffs' pursuing separate individual claims would hinder them from also representing LICOA's interests in the derivative claims. Rather, Plaintiffs' individual dissolution claim would provide a definitive and sweeping end to corporate waste, while their derivative claims would penalize the Director Defendants for their wasteful practices. So the court finds no conflicting interest between Plaintiffs' claims and the interests of LICOA, including *most* of LICOA's shareholders.

The obvious exception to this conclusion is that Plaintiffs' derivative claims do not serve the interests of the Director Defendants, who are also shareholders. But a plaintiff's derivative claims may target fellow shareholders without destroying the plaintiff's standing because "the waste of corporate assets by majority stockholders is primarily an injury to the corporation itself. . . . If the corporation refused to assert its cause of action, an action may be maintained by the stockholders on behalf of the corporation." *Stallworth v. AmSouth Bank of Ala.*, 709 So. 2d 458, 465–66 (Ala. 1997) (citation omitted). So Plaintiffs do not lack standing simply because they are suing the Directors, who are also shareholders.

Further, the court finds no issue with Plaintiffs presenting an individual claim for LICOA's dissolution alongside derivative claims on LICOA's behalf. As explained before, Section 7.42 does not require Plaintiffs to preserve LICOA's interest in every respect; they must merely preserve LICOA's interest "in enforcing the right of the corporation." Ala. Code § 10A–2A–7.42(1). Plaintiffs are attempting to enforce the corporation's rights through their derivative claims. And Defendants have not convinced the court that Plaintiffs' individual claims will inhibit those efforts.

For example, Defendants ask the court to take judicial notice of two shareholder derivative suits brought by Plaintiff Trondheim Capital Partners in other jurisdictions against

other corporations. (Doc. 57 at 10). Defendants argue that these cases show that "lead Plaintiff Trondheim is aggressively targeting small corporations for the sole purpose [of] leveraging a significant buy out of Trondheim's stock." (Doc. 57 at 10). But the pleadings in those cases indicates that Trondheim's claims differ from those here; most notably, Trondheim did not seek dissolution in those suits. Also, Alabama courts have rejected arguments challenging a shareholder-plaintiff's standing based on the plaintiff's bringing similar derivative suits if the defendant fails to show that the plaintiff's derivative claims in the case at bar will "be compromised or used to achieve a settlement or gain" in the similar cases. *See Elgin*, 598 So. 2d at 822. Here, Defendants fail to explain how Plaintiff Trondheim Capital Partners could use this case to "achieve a settlement or gain" in separate derivative suits in other jurisdictions against other parties. So Defendants have not shown that Plaintiffs' derivative suits against other companies will hinder their ability to enforce LICOA's rights in this case.

Rather, Plaintiffs have incentive to vigorously pursue both the individual claim for dissolution and the derivative claims because those claims share a common subject matter: the Director Defendants' alleged waste. *See Elgin*, 598 So. 2d at 819. So, Plaintiffs' litigation efforts concerning the facts underlying their individual dissolution claim will directly serve their derivative claims also. Further, the corporation—not the Plaintiffs—recovers the damages from successful derivative claims. *See Robbins*, 890 So. 2d at 1014. So, the damages link the success of Plaintiffs' individual and derivative claims; if successful, the damages from Plaintiffs' derivative claims would benefit LICOA, which in turn results in a greater per-share payout if Plaintiffs' individual dissolution claim succeeds. In short, Plaintiffs benefit from thoroughly litigating both the individual and derivative claims.

Finally, although Alabama's courts have not ruled on the issue, at least two other state's high courts have found that plaintiffs do not lose their standing to bring derivative claims when they bring individual dissolution claims in the same suit. *See Angel Investors, LLC v. Garrity*, 216 P.3d 944, 954 (Utah 2009) ("Dissolution would not only stop the looting but would also allow for reorganization of the enterprise, such that all shareholders could receive a fairer return on their investment."); *accord Cattano v. Bragg*, 727 S.E.2d 625, 630 (Va. 2012).

The court finds that Plaintiffs' individual claims do not prevent them from fairly and adequately representing the derivative claims. So the court will deny Defendants' motion to dismiss on the grounds that Plaintiffs lack standing.

### b.  *Litigation Demand and Rejection Under Rule 23.1*

Assured of Plaintiffs' standing, the court can now turn to Plaintiffs' litigation demand and LICOA's decision to reject Plaintiffs' claims. In *Roberts*, the Alabama Supreme Court stated:

> Upon finding that a special committee of disinterested directors has determined in good faith and after a thorough investigation that it is not in the company's best interests to allow an action to proceed, the "business judgment rule" would not allow the courts to interfere with the committee's determination.

404 So. 2d at 632.

The rationale of *Roberts* will guide this court's analysis in the sections that follow. In this section, the court will assess whether Plaintiffs made an adequate litigation demand on LICOA's board. Next, the court will assess whether Directors Smith and Cobb were disinterested and independent in handling that demand. The court will also assess whether the Lightfoot firm was independent for purposes of its investigation. Finally, the court will assess whether Smith and Cobb recommended that the Board reject Plaintiff's demand in good faith and after a thorough investigation. Because the court finds that the answer to each of these inquiries is yes, the court will dismiss Plaintiffs' derivative claims out of deference to LICOA's business judgment in

rejecting those claims.

Defendants initially challenge whether Plaintiffs made a proper litigation demand because Plaintiffs' demand letter "does not reflect that any demand was made as derivative plaintiffs or that any specific relief (other than an 'investigation') was requested." (Doc. 57 at 13). Plaintiffs' September 2019 letter predated their derivative claims, which Plaintiffs first stated in their amended complaint in June 2020. (Doc. 25) But LICOA argues that the letter did not adequately set forth the Plaintiffs' efforts "to obtain the desired action from the directors" because the letter did not announce "derivative" claims. *See* Fed. R. Civ. P. 23.1(b)(3)(A).[3]

The Federal Rules of Civil Procedure require a derivative plaintiff to "state with particularity . . . any effort by the plaintiff to obtain the desired action from the directors or comparable authority." Fed. R. Civ. P. 23.1(b)(3)(A). The Supreme Court has held that this rule merely "contemplates" a demand requirement. *Kamen v. Kemper Fin. Servs., Inc.*, 500 U.S. 90, 96 (1991). But if a state defines the substance of an adequate demand, then the federal court must apply those principles. *Id.*; *see also Stepak v. Addison*, 20 F.3d 398, 402 (11th Cir. 1994) ("Because [Defendant] is a Delaware corporation, Delaware law governs the extent of the demand requirement."). Because LICOA is incorporated in Alabama, the court looks to Alabama law to discern whether Plaintiffs made an adequate demand on LICOA's board.

In Alabama, shareholder plaintiffs must make a demand before filing derivative claims. *See Stallworth v. AmSouth Bank of Ala.*, 709 So. 2d 458, 463 (Ala. 1997). The purpose of the demand is to "alert the board so that it can take corrective action, if it feels any is merited." *Id.* If the board rejects such a demand, the shareholder plaintiff may file derivative claims. *Id*. The Alabama Supreme Court has provided these elements to determine the sufficiency of a demand:

---

[3] The court notes the incongruence between Defendants' first arguments that Plaintiffs did not make an adequate demand and their second argument that Defendants properly rejected Plaintiffs' (presumably adequate) demand. The court rejects the first argument and accepts the second.

"At a minimum, the demand should [(1)] identify the alleged wrongdoers, [(2)] describe the factual basis of the wrongful acts and the harm caused to the corporation, and [(3)] request remedial relief." *Id.* at 463–64.

The court finds that Plaintiffs' September 2019 letter properly demanded the board's action as to their derivative claims, even though the letter lacked terminology announcing "derivative" claims or seeking "litigation." The September 2019 letter meets *Stallworth*'s first element because it identifies the alleged wrongdoers as "the Directors" engaging in waste and other alleged wrongs. (Doc. 54-16 at 2–3); *see Stallworth*, 709 So. 2d at 463–64.

The letter also meets *Stallworth*'s second element because it identifies the "wrongful acts" as the Directors' alleged purchase of stocks at depressed prices, failure to follow up on buyout offers, and wasteful and nepotistic employment practices. (Doc. 54-16 at 2–3). These facts describe the same wrongful acts and harms that now form the basis of Plaintiffs' derivative claims.

The letter meets *Stallworth*'s third element by asking LICOA to "investigate all circumstances surrounding these events" and to "take appropriate action on behalf of LICOA." (Doc. 54-16 at 2–4). As an initial matter, these terms almost directly mirror the purpose of the demand requirement, which is to allow the board to "take corrective action." *Stallworth*, 709 So. 2d at 463. Even so, Defendants argue that these statements fail to specifically call on LICOA to sue the directors on behalf of the corporation. (Doc. 57 at 13). But Plaintiffs' letter describes the Directors' "taking of a corporate opportunity *of LICOA*," "breach of fiduciary duty" *to LICOA*, and misuse of funds that "should be recovered *by LICOA*." (Doc. 54-16 at 3) (emphases added). These allegations describe "wrong[s] committed primarily against the corporation," meaning that LICOA's board must either "take corrective action" or reject Plaintiffs' allegations and allow

Plaintiffs to proceed to a derivative action. *See Stallworth*, 709 So. 2d at 463. Finally, Lightfoot's first memorandum investigating the demand letter states, "LICOA believed that the Lawsuit included claims or causes of action belonging to LICOA and not to the plaintiffs." (Doc. 57-1 at 2). So according to LICOA's own investigators, LICOA itself interpreted the letter as presenting claims that LICOA should act on or reject. The Directors' rejection of the letter's call to investigate the alleged wrongs and take necessary action permitted Plaintiffs to file their derivative claims as to those wrongs.

In short, Plaintiffs' letter gave LICOA the opportunity to take corrective action as to the derivative allegations that Plaintiffs ultimately filed. So, the court concludes that Plaintiffs' September 2019 demand letter sufficiently stated a litigation demand as to Plaintiffs' derivative claims.

### c.   *Whether the Lightfoot Firm and Directors Cobb and Smith Are Independent*

On recommendation from Directors Smith and Cobb, LICOA rejected Plaintiffs' litigation demand, both in July 2020 as to Plaintiffs' earlier complaints (doc. 54 at 31), and again in April 2021 as to Plaintiffs' current complaint (doc. 64). So the court now turns its attention to the next inquiry under *Roberts*—whether the Lightfoot firm and Directors Smith and Cobb are disinterested and independent. *See Roberts*, 404 So. 2d at 632.

### i.   **Directors Smith and Cobb's Independence**

Plaintiffs argue that Directors Smith and Cobb lack independence because (1) Smith and Cobb receive "perks" such as free trips to overseas locations in exchange for serving as directors, and (2) they failed to investigate claims such as Plaintiffs' waste claim in a timely fashion.

Under Alabama law, a director is independent so long as he does "not have (i) a material interest in the outcome of the proceeding, or (ii) a material relationship with a person who has

such an interest." Ala. Code § 10A–2A–1.43(a)(2). The Alabama Code defines those terms as follows:

> (1) "material relationship" means a familial, financial, professional, employment, or other relationship that would reasonably be expected to impair the objectivity of the director's judgment when participating in the action to be taken; and
>
> (2) "material interest" means an actual or potential benefit or detriment (other than one which would devolve on the corporation or the stockholders generally) that would reasonably be expected to impair the objectivity of the director's judgment when participating in the action to be taken.

Ala. Code § 10A–2A–1.43(b).

Further, *Roberts* instructs that independent directors should be "uninfluenced by any consideration other than what they honestly believe to be the best interest of the corporation." 404 So. 2d at 631 (finding that a "Special Committee consist[ing] of two lawyers with unquestioned reputations for integrity . . . neither of whom were dependent on the Company for their livelihood" was independent). But when an independent director "is alleged to have received any personal gain from the acts complained of," such allegations "*could* . . . show a *possible* lack of good faith and independence." *Id.* at 636 (emphasis added). In other words, independent directors may not possess a "dual relation which prevents an unprejudiced exercise of judgment." *Id.* at 632.

Here, Plaintiffs are correct that Smith and Cobb participate in annual incentive trips to "exotic locales," such as New Zealand and the Mediterranean. (Doc. 65 at 21). They also receive yearly compensation between $4,300 and $9,000. (*Id.*). So, Smith and Cobb arguably receive a personal gain from Defendants' allegedly wasteful director perks; however that fact only shows a "*possible* lack of good faith and independence." *See Roberts*, 404 So. 2d at 636 (emphasis added).

23

But the applicable Code provisions show the weakness of Plaintiffs' challenge. For example, Plaintiffs do not argue that Directors Smith and Cobb possess "material relationships" that cloud their judgment. *See* Ala. Code § 10A–2A–1.43(b)(1). And Plaintiffs have not convinced the court that the incentive trips present a "material interest" that would be reasonably expected to impair Smith and Cobb's objectivity. *See* Ala. Code § 10A–2A–1.43(b)(2). For example, Smith and Cobb both have careers outside of LICOA; so they are not "dependent on the Company for their livelihood." *See Roberts*, 404 So. 2d at 633. And Smith and Cobb's annual director stipend is modest; so even if Plaintiffs are correct that the value of the annual trips may "equal nearly to the entire fees" that LICOA pays Smith and Cobb per year, that amount would not be staggering. (Doc. 65 at 21). After all, the law does not prohibit Smith and Cobb from benefitting financially from LICOA as long as their objectivity about the investigation does not suffer. *See* Ala. Code § 10A–2A–1.43(b). Absent any other evidence of bias by Smith and Cobb, the court does not find that the director perks create a "dual relation which prevents an unprejudiced exercise of judgment" in evaluating the Plaintiffs' demand. *See Roberts*, 404 So. 2d at 632.

Next, Plaintiffs argue that Smith and Cobb are interested because "the *only* claims th[ey] had Lightfoot 'investigate' were those that were pending in this litigation at that time." (Doc. 65 at 22). But as explained below, the court finds that Lightfoot—at the direction of Smith and Cobb—ultimately investigated *all* of Plaintiffs' claims before completing its final memo. Plaintiffs cite no authority for their argument that Smith and Cobb's investigating some claims earlier than others casts doubts on their independence. In fact, Delaware's landmark demand-rejection case shows that a corporation's demand investigation may stretch long after the plaintiff files his complaint. *See Zapata Corp v. Maldonado*, 430 A.2d 779 (Del. 1981)

(addressing rejection decision that occurred four years after plaintiff filed his complaint); *see also Peller v. Southern Co.*, 911 F.2d 1532, 1534 (11th Cir. 1990) (addressing, under Georgia law, rejection investigation spanning sixteen months). What matters is that Smith and Cobb conducted a good faith and thorough investigation concerning all claims *sometime* before making their final rejection recommendation in May 2021; the court will explain below that they did so. *See Roberts*, 404 So. 2d at 632. And Plaintiffs have not explained how Cobb and Smith's investigation timing reveals a "material interest" or "material relationships" that would inhibit their objectivity. *See* Ala. Code § 10A–2A–1.43(b).

Finally, the broader timeline of Smith and Cobb's investigation indicates their diligence. The relevant documents do not indicate when Smith and Cobb first engaged Lightfoot, but Lightfoot produced its first report in November 2019—two months after Plaintiffs' demand letter. (Doc. 54 at 31). And Smith and Cobb re-engaged Lightfoot to investigate the current complaint *a mere three days* after Plaintiffs filed it. *Compare* (doc. 65-1 at 4, Lightfoot email dated April 15, 2021) *with* (doc. 54, complaint filed April 12, 2021). Smith and Cobb's quick efforts to engage Lightfoot show their speed in pursuing "the best interest of the corporation." *See Roberts*, 404 So. 2d at 631. Thus, the court finds no error in Smith and Cobb's decision to delay fully investigating and rejecting Plaintiff's claims until mid-May 2021, barely a month after Plaintiffs filed their current complaint.

The court concludes that Plaintiffs' challenges do not show that Directors Smith and Cobb suffered a lack of independence in their rejection decision.

### ii.  The Lightfoot Firm's Independence

Plaintiffs also challenge the Lightfoot firm's independence, vigorously arguing that Lightfoot's lawyers, Glenn Waldrop and Jack Sharman, improperly relied on input from

Defendants' counsel, Mike Haney.

Plaintiffs open their response brief with an email exchange between Lightfoot lawyers Waldrop and Sharman. Waldrop states that he "spoke with Mike Haney [(Defendants' counsel)] this afternoon about four topics"; he explains the contents of their conversation regarding (1) LICOA's purchase of a large number of shares from the Jacobs family, (2) potential testimony that one of Plaintiffs' witnesses may offer in the case, (3) the allegedly lavish incentive trips for directors, and (4) offers to buy out LICOA. (Doc. 65-1 at 4–5).

As to the Jacobs share purchase, Waldrop's retelling of Haney's version of the story differs substantially from the story presented in the final Lightfoot report. According to the email, Haney stated that the Jacobses were "high maintenance" shareholders and that LICOA's board made a flat offer to purchase their shares at an unnegotiated price. (Doc. 65-1 at 5). As to the incentive trips, Waldrop recounts Haney's description of the trips, and Waldrop opines that LICOA's offering such perks is a "classic business judgment rule decision." (Doc. 65-1 at 5). Plaintiffs argue that this email shows that Haney "frame[d] the narrative and provide[d] information in a way designed to arrive at conclusions favorable to Defendants." (Doc. 65 at 5).

The court could find no Alabama case law addressing the standard of independence for outside counsel hired to investigate derivative claims. Nor could the court find case law addressing the relationship between hired independent counsel and the defendant-directors' counsel (i.e., between Waldrop and Haney). But the court finds no distinction between the standard for independent hired counsel and independent directors themselves; counsel must function "independently and in good faith." *Roberts*, 404 So. 2d at 636.

The Eleventh Circuit has stated that hired counsel must be "capable of independently evaluating the corporation's interests" and able to "exercise its mission competently and

impartially." *Stepak v. Addison*, 20 F.3d 398, 411 (11th Cir. 1994) (applying Georgia law). In *Stepak*, the Circuit Court found that an investigating law firm lacked independence because that firm had also represented the director-defendants in criminal proceedings concerning the same conduct challenged by the plaintiffs' derivative claims. *Id.*; *see also Kaplan v. Wyatt*, 499 A.2d 1184, 1190 (Del. 1985) (finding no conflict of interest when investigating counsel was previously a losing party in case that shareholder-plaintiffs' attorneys litigated).

The court does not find that the conversation reflected in Waldrop's email undermines Lightfoot's independence in the investigation. Although little case law addresses contact between investigating counsel and counsel for the corporation, the email's conversation presents no conflict of interest like that present in *Stepak*, where the "independent" investigating firm had previously represented the *same* defendant-directors in criminal proceedings as to the *same alleged conduct*. *See Stepak*, 20 F.3d at 411. Plaintiffs have not alleged that Lightfoot represented LICOA or any of the parties to this suit in any other matters. *See* (Doc. 64-1 at 5, asserting that Lightfoot has not done so).

Further, the court finds some analogy for Waldrop and Haney's conversation in the relationship between disinterested and interested directors. In that context, courts have noted, "it would be a strained and artificial rule which required a director to be unacquainted or uninvolved with fellow directors in order to be regarded as independent." *Sutherland v. Sutherland*, 958 A.2d 235, 241 (Del. Ch. 2008). Likewise here, it would be a "strained and artificial rule" that prevented independent counsel (Waldrop) from merely receiving background information as to the case from Defendants' counsel (Haney). The court does not find that the conversation reflected in the email tainted Lightfoot's independence as to the investigation. *See also Deal*, 991 F.3d at 1320 (rejecting plaintiff shareholder's argument that independent director improperly

formed "prejudgment" about defendants' conduct based on prior participation in litigation demand investigations).

In fact, the conversation reflected in Waldrop's email supports Lightfoot's independence. Lightfoot's later investigation of the Jacobs stock purchase uncovered a narrative differing from Haney's but consistently reiterated across four separate interviews with LICOA employees: that the Jacobs approached the LICOA board to sell; that the Jacobs provided the sale amount; and that the Board approved the purchase because the price was lower than book value. (Doc. 64-1 at 11, *et seq*.). This story differs from Haney's claims that the Jacobs were "high maintenance" and that the board offered an unnegotiated purchase price. But even if Lightfoot's final story favors Defendants, that fact, standing alone, creates no doubt as to Lightfoot's good faith or independence. Rather, Lightfoot's departure from Haney's impressions shows that Lightfoot did not blindly rely on Haney to "frame the narrative," as Plaintiffs argue. (Doc. 65 at 17). Lightfoot's efforts to interview several witnesses about the Jacobs purchase—and the story those interviews produced—shows that Lightfoot "exercise[d] its mission competently and impartially" by seeking all available information before arriving at its conclusion. *See Stepak*, 20 F.3d at 411.

Plaintiffs also challenge Waldrop's initial assessment that LICOA's decision to send directors and top salespersons on vacations represents "classic business judgment." Here, the court finds even less cause for concern because Haney appears not to have urged this statement at all. Waldrop made it on his own behalf in expressing his first impressions of the issue to his fellow Lightfoot investigator. Also, Directors Smith and Cobb called on Lightfoot to "evaluat[e] the corporation's interests." *See Stepak*, 20 F.3d at 411. Waldrop's anticipating possible defenses to Plaintiffs' allegations (such as the business judgment rule) merely shows his consideration of

28

the legal issues affecting the corporation's interests. And as the court will explain in the next section, Lightfoot's thorough investigation shows that Waldrop did not rest on his initial assumptions.

In sum, the court finds no problem with Lightfoot's independence based on Waldrop's conversations with Haney, as reflected in the email.

### d. Whether Directors Smith and Cobb Reached their Rejection Recommendation in Good Faith and After a Thorough Investigation

Although LICOA's Board of Directors ultimately rejected Plaintiffs' derivative claims, it did so on the recommendation of Directors Smith and Cobb, who in turn relied on the Lightfoot report. (Doc. 64 at 2).

The court must first determine which entity's good faith and thoroughness it must analyze. When a corporation appoints an independent committee of directors to investigate a derivative litigation demand, the court typically assesses whether the "*committee* has determined in good faith and after a thorough investigation that it is not in the company's best interests to allow an action to proceed." *Roberts*, 404 So. 2d at 632 (emphasis added). As in this case, independent directors often retain outside counsel to conduct the investigation. *See, e.g.*, *Stepak v. Addison*, 20 F.3d 398, 405 (11th Cir. 1994) (interpreting Delaware law). Under this circumstance, the court must assess the efforts of "*the investigator* to exercise its mission competently and impartially." *Id.* at 411 (emphasis added).

But courts generally employ no different legal analysis as to the thoroughness of investigations conducted by independent directors versus those conducted by outside counsel. In fact, courts rarely distinguish between the independent directors and their counsel whatsoever when conducting that analysis. *See, e.g.*, *In re General Tire & Rubber Co. Secs. Litig.*, 726 F.2d 1075, 1078 (6th Cir. 1984) (assessing whether corporation's litigation committee and outside

counsel's *collective efforts* produced a sufficient "compilation of facts which formed the 'bases' for the Committee's recommendations"); *Johnson v. Hui*, 911 F. Supp. 479, 483 (N.D. Cal. 1991) (same).

Based on this authority, the court will analyze the good faith and thoroughness of the Lightfoot report on which Smith and Cobb relied in making their rejection recommendation. But the court will rely on cases assessing the thoroughness of independent directors' investigations.

Most importantly, directors rejecting derivative claims bear the duty of gathering "all material information reasonably available." *Stepak*, 20 F.3d at 410 (quoting *Smith v. Van Gorkom*, 488 A.2d 858, 872 (Del. 1985)). Another key factor is whether the investigation addresses "every paragraph and allegation of misconduct" that the shareholder-plaintiff alleges. *Deal v. Tugalo Gas Co., Inc.*, 991 F.3d 1313, 1321 (11th Cir. 2021) (applying Georgia and Delaware law); *see also Kaplan v. Wyatt*, 499 A.2d 1184, 1190 (Del. 1985). And as stated before, the court's "job isn't to evaluate whether the [committee] was *correct* to recommend against a derivative action, but simply to determine whether the [committee] had a valid *process* for deciding whether or not to do so." *Id.*

The court finds helpful two examples of "good faith and thorough" investigations. The Court in *Roberts* found an *adequate* investigation when the corporation's Special Committee interviewed fifteen witnesses, made two site visits to corporate headquarters, inspected "all pertinent documentary evidence," and summarized their findings in a twenty-four-page report. *Roberts*, 404 So. 2d at 633. And the Eleventh Circuit recently found an adequate investigation when the Litigation Committee "went through every paragraph and allegation of misconduct in the original complaint, interviewed those accused of wrongdoing and other employees with knowledge of [the corporation]'s finances, and . . . its report comprised only about five pages."

*Deal*, 991 F.3d at 1321.

On the other hand, one Delaware court found an *insufficient* investigation despite the Special Litigation Committee's producing a 350-page report of its findings. *Sutherland v. Sutherland*, 958 A.2d 235 (Del. Ch. 2008). The investigation's report failed to explain two conflicted-interest payments representing "a large portion of [the director]'s total compensation" for the year. *Id.* at 242. Instead, the report presented only "innocent, generally available" evidence. *Id.* at 243. Further, the report offered only "a thumbnail summary" of several key witness interviews, lacking details and findings. *Id.* And the investigators failed to research invoices and ledgers of personal expenses that the plaintiffs' complaint specifically addressed. *Id.* at 244. The court will draw on these examples as it assesses the sufficiency of Lightfoot's investigation, which informed Directors Smith and Cobb's recommendation.

Here, Lightfoot's report to Smith and Cobb considered, among other things, records of directors' stock purchases; LICOA's annual financial statements; LICOA's policies for director travel, expenses, and reimbursements; salary records; Alabama Department of Insurance reports; and documentation of the identity and percentage ownership of shareholders. (Doc. 64-1 at 6, 12). And Lightfoot interviewed a total of ten witnesses. (*Id.* at 22 *et seq.*). The final Lightfoot report totals twenty-nine pages.

At the outset, the court finds that Lightfoot's investigation checks many of the boxes of a thorough and good faith investigation. The report accounts for both good and bad evidence, rather than reporting only "innocent, generally available" material. *See Sutherland*, 958 A.2d at 243. Lightfoot also "interviewed those accused of wrongdoing," including every Director-Defendant and other executives with knowledge of the alleged wrongs. *See Deal*, 991 F.3d at 1321. And Lightfoot's report captured far more than "thumbnail summaries" of these interviews.

31

*See Sutherland*, 958 A.2d at 243. Further, Lightfoot's account of the materials it reviewed appears to include "all pertinent documentary evidence," *see Roberts*, 404 So. 2d at 633, and does not overlook any documents or charges in Plaintiffs' pleadings, *see Sutherland*, 958 A.2d at 244. Finally, the report's length is almost identical to that in *Roberts*.

But a better measure of whether Lightfoot's report enabled Smith and Cobb to reach a good faith and thorough recommendation is whether the report addresses "every paragraph and allegation of misconduct" in Plaintiffs' current complaint. *See Deal*, 991 F.3d at 1321; *see also Kaplan v. Wyatt*, 499 A.2d 1184, 1190 (Del. 1985) (examining whether litigation committee "failed to investigate all of the matters alleged in [plaintiff's] complaint"). As explained below, the court finds that the report sufficiently investigated and informed Smith and Cobb as to each allegation and the result of its investigation of each allegation.

### i. Plaintiffs' Count One: Devaluation

Plaintiffs allege that Defendants intentionally devalued LICOA's stock when they "purposefully overcapitalized LICOA and overpaid family members to depress share value." (Doc. 54 at 41–42). The Lightfoot memos recap several witnesses' explanation of the advantages of LICOA's current capital surplus in challenging financial times such as the COVID-19 era and in "lean" times such as LICOA's financial struggles of the early 2000s. (Doc. 64-1 at 8–10). They also remarked that the capital surplus permits LICOA to reduce its borrowing for expensive technology and building expansions. (*Id.* at 19).

Also, nearly every witness stated that the capital surplus boosts the company's "A.M. Best" rating, which builds LICOA's status in the insurance industry and helps attract talented salespeople. (Doc. 64-1 at 17, 21). Plaintiffs now argue that the directors' A.M. Best justification is a "'made for litigation' strategy" that is mistaken as to the true foundations for A.M. Best

ratings. (Doc. 65 at 20). Plaintiffs also attack Lightfoot for not seeking documents to substantiate this justification. But several director interviews and documents *do* corroborate this explanation; Plaintiffs' complaint attached minutes from a LICOA board meeting where the board considered its A.M. Best rating to be "the result of the Company's financial strength, operating performance, asset quality and *capitalization*." (Doc. 54-7 at 3) (emphasis added). This meeting occurred on May 4, 2015, long before this case. Further, when interviewed about the A.M. Best rating, Daugette told Lightfoot that he had offered this justification for the overcapitalization at a prior shareholder meeting, and referenced the A.M. Best rating going back to the early 2000s. (Doc. 64-1 at 10). So the court doubts that the A.M. Best justification is "made for litigation."

At any rate, the court's focus is the "process" of Lightfoot's investigation, rather than the "correctness" of the views uncovered. *See Deal*, 991 F.3d at 1321. Even if the directors were incorrect about the methods for improving LICOA's A.M. Best rating, the court finds no allegations or evidence that the directors offered this justification in bad faith or that Lightfoot failed to fully investigate it.

Further, Plaintiffs do not dispute the Directors' additional explanations for overcapitalization: that it keeps LICOA afloat in lean times and reduces LICOA's borrowing needs. And the report found that LICOA's capital is not sitting idle; LICOA invests its capital for a return through an asset management company. (Doc. 64-1 at 22). So the court finds no error in Lightfoot's thoroughness or investigative process as to the overcapitalization issue.

The court also finds that the Lightfoot investigation sufficiently addressed Defendants' alleged efforts to depress share values. Plaintiffs attack the Lightfoot report for failing to address *why* LICOA shares trade at a depressed value. (Doc. 65 at 20). But the interviews captured in the Lightfoot report explain that the fluctuating stock price resulted from LICOA's lack of formal

33

procedures governing stock sales. LICOA's chief operating officer stated that "LICOA stock is lightly traded, and generally in private transactions." (Doc. 64-1 at 7). Other witnesses stated that the small size of LICOA's hometown of Gadsden led to rather haphazard stock sales; sometimes a seller simply asked the buyer to "pay what he had paid when he acquired the 200 shares," (doc. 64-1 at 8), while others "looked to see the latest trade price and offered . . . that amount," (doc. 64-1 at 21). After Plaintiffs filed suit, LICOA acted to end unnegotiated stock sales by implementing a policy that notifies those interested in selling LICOA stock of *all* persons interested in buying. (*Id.* at 7). And LICOA recently hired "Computershare," a transfer agent that will manage LICOA stock and facilitate buyer-seller negotiations. (*Id.* at 23). The court respects Lightfoot's investigations as to these facts and its finding that LICOA's internal corrective steps served LICOA's interests better than litigation.

Finally, Plaintiffs allege that the Defendant-Directors depreciated LICOA's stock "with the further intent to enable themselves or another person, to buy LICOA's stock at less than its real value." (Doc. 54 at 43). Here, the Lightfoot report confirms the court's own assessment that Plaintiffs generally lack factual allegations supporting this claim. Although Plaintiffs allege facts showing that the Director Defendants recently acquired shares (doc. 54 at 42), they provide no allegations showing the *prices* at which these sales occurred or showing that Defendants had an *intent* to depreciate prices as to those purchases—a required element under the statute. *See* Ala. Code § 10A–2–8.32. The lone exception is Clarence Daugette's purchase of just under 400 shares at $10–15 per share in 2020, which Lightfoot investigated and which the court will address in the next section. Otherwise, Lightfoot's finding that most of the Directors rarely buy personal shares confirms Plaintiffs' lack of factual allegations for such claims. (Doc. 64-1 at 9, 21–22). And Lightfoot found that the harm to LICOA from such infrequent purchases does not "warrant the

time, expense and distraction inherent to a lawsuit." (Doc. 64-1 at 27). So Lightfoot sufficiently investigated this matter.

In sum, the court finds that the Lightfoot report sufficiently investigated the facts underlying Plaintiffs' devaluation claim. And Directors Smith and Cobb properly relied on the report as to this claim.

### ii.   Plaintiffs' Count Four: Usurping Corporate Opportunity via Share Repurchase

Plaintiffs claim that the Directors usurped a corporate opportunity by personally purchasing shares at depressed values. (Doc. 54 at 46).

As described above, Lightfoot's investigation found that LICOA implemented new policies in 2019 to curb off-the-record stock purchases in which sellers had little bargaining power. Even so, the report explains that Clarence Daugette purchased just under 400 shares in 2020 at below book value.[4] Lightfoot examined several documents and asked witnesses about these transactions; to its credit, Lightfoot concluded that Daugette's purchases likely violated the 2019 policy. (Doc. 64-1 at 15); *see Sutherland*, 958 A.2d at 243 (rejecting investigation that reported only "innocent, generally available" evidence). After his apparent failure to abide by the new policy, Daugette reported that he removed his name from the pool of potential buyers for later stock sales. (Doc. 64-1 at 24). And the report proposed a corrective measure the board could take outside of litigation: the board could purchase the shares from Daugette at the same price he purchased them. (Doc. 64-1 at 27). Daugette told the Lightfoot investigators that he would be happy to sell the shares back to LICOA for that price, but the parties do not state whether the

---

[4] Plaintiffs' complaint does not indicate how many LICOA shares exist, but Plaintiffs' shareholdings in LICOA total nearly 93,000 shares. (Doc. 54 at 9). And the Lightfoot memo reports that the Director Defendants' shareholdings in LICOA totaled nearly 147,000 shares, with Daugette holding just over 54,000 shares personally. (Doc. 64-1 at 14). Taking the Lightfoot memo's report as accurate, Daugette's purchase of 400 shares increased his holdings by less than 1%.

board has made that purchase. Based on these findings, the court finds that Lightfoot adequately investigated this issue.

Plaintiffs' depressed-share claim also implicates the board's purchase of LICOA shares from the Jacobs family. In June 2020, the LICOA board voted to purchase nearly 7,000 shares at a price of $31 per share from the Jacobs family.[5] But contrary to Plaintiffs' argument, both the board minutes attached to Plaintiffs' complaint and Lightfoot's investigation rationally explain the Jacobs purchase. The Jacobs family offered the price, and the board seized the opportunity to purchase a large block of shares at a price that was below "book value." (Doc. 54-9 at 2; doc. 64-1 at 22–23).

Plaintiffs also argue that Lightfoot wrongly "sanitized" the story of the Jacobs purchase in its memo. But several witness interviews corroborate Lightfoot's account of the purchase, as do the board minutes that Plaintiffs attached to their complaint. (Doc. 54-9 at 2) (stating that the Jacobs family "*offered* their stock holdings for the sum of $400,000") (emphasis added). Only Haney—Defendants' counsel who played no role in the Jacobs share purchase—presented a contrary narrative. (Doc. 65-1). As explained above, the court finds it reassuring, rather than troubling, that Lightfoot discarded Haney's narrative in favor of three consistent witness interviews and board minutes. *See Stepak*, 20 F.3d at 410 (requiring that outside counsel present to the directors "all material information reasonably available."). In sum, the court finds that Lightfoot sufficiently investigated this issue, and Directors Smith and Cobb properly relied on the Lightfoot report in their recommendation to the board.

### iii.   Plaintiffs' Count Five: Usurping Corporate Opportunity via Buyout Offers

Next, Lightfoot investigated Plaintiffs' fifth claim: usurping a corporate opportunity by

---

[5] Neither Plaintiffs' complaint nor the documents that the court considered indicate how many LICOA shares that LICOA owns or the effect of this purchase on its shareholdings.

failing to fully consider offers to buyout LICOA. Lightfoot appeared to ask *every* witness about this claim, with most of them reporting no knowledge of any bona fide offers to buy LICOA. (Doc. 64-1 at 17 *et seq.*).

Several witnesses remembered "cold calls" by "investment banker types" who did not represent identifiable purchasers and who were merely interested in whether LICOA was interested in selling, rather than presenting an offer. (Doc. 64-1 at 7). As such, the board took no action on those calls. Causey recalled an offer to buy a *portion* of LICOA's business—its "unlimited cancer book"—but she recalled that the Directors rejected that offer because that book of business was profitable. (*Id.* at 9). And Clarence Daugette recalled only one offer from a Georgia company to buy LICOA outright "a number of years ago." (*Id.* at 10). The memo reports that Daugette "did not feel they would be a good fit" because the offering company was a mutual company, unlike LICOA, a stock company. (*Id.*). But the memo does not state whether Daugette or LICOA's board formally rejected that buyout offer.

The court also finds in Plaintiffs' current complaint and attached exhibits no evidence that any buyout offers were made besides Daugette's alleged admission of such offers. Given the dearth of evidence, the court cannot fault Lightfoot's investigative process nor its conclusion that "no basis for this claim" exists. (Doc. 64-1 at 27). Directors Smith and Cobb properly relied on Lightfoot's report in making their recommendation concerning this claim also.

### iv.    Plaintiffs' Count Six: Corporate Waste

Finally, Lightfoot sufficiently investigated Plaintiffs' sweeping sixth claim for corporate waste based on allegedly excessive executive salaries, directors' receiving both officer and director salaries, improperly expensed personal items, and lavish incentive trips.

As to director salaries, several witnesses agreed that LICOA's officers do not make

additional salaries for their service as directors, if they serve in both roles. (Doc. 64-1 at 23).

Lightfoot considered documents regarding director and officer compensation, finding no

evidence to the contrary. (Doc. 64-1 at 13, 28). As to the improperly expensed items, Lightfoot

found that LICOA ceased this practice after the Alabama Department of Insurance's warnings in

the 2005 report. Lightfoot also examined several reports of individual directors' expenses,

concluding that they were minimal and, at any rate, reasonable. (Doc. 64-1 at 23–24).

  Lightfoot also inquired into LICOA's allegedly excessive executive compensation. The

parties admit that LICOA's salaries are hard to compare because few insurance companies exist

with a portfolio and size similar to LICOA. (Doc. 65 at 26). But witnesses attested that salaries

for LICOA's president and vice presidents, which range from roughly $325,000–360,000 each,

were "reasonable." (Doc. 64-1 at 23). And Lightfoot compared the salaries of LICOA's president

and vice president to the salaries of the same officers at larger insurance companies like Globe

Life and Protective Life. (Doc. 64-1 at 28). Lightfoot found that LICOA's officers' salaries were

less than 20% of those at the larger competing companies. (*Id.*).

  Even so, Plaintiffs specifically challenge whether "anyone" would pay Rosalie Causey,

LICOA's vice president, a similar salary. (Doc. 65 at 26). But the Lightfoot report accounts for

Causey's history with the company going back to 2002, including the significant experience she

has gained and responsibilities she has assumed over the years. (Doc. 64-1 at 9). And although

Plaintiffs' complaint challenges Causey's salary as "not based on the market value of services

rendered," Plaintiffs provide no alternative figure or comparison for a more appropriate salary.

(Doc. 54 at 16). Lightfoot's comparison found that vice presidents at Globe Life make over

seven times as much as Causey. (Doc. 64-1 at 28). So although Causey may have acquired her

job some twenty years ago through family ties, the court respects Lightfoot's investigation as to

her current role as vice president and her salary.

Next, Plaintiffs challenge the Lightfoot report's failure to recognize that Defendants, as directors *and* officers, engage in a "self-dealing transaction" by setting their own officer compensation. (Doc. 65 at 25). The court disagrees. Plaintiffs rely on an unpublished Delaware case in which the company's board, which set officer salaries, consisted *entirely of directors who also served as officers. See Ravenswood Inv. Co., L.P. v. Est. of Windmill*, No. cv 3730-VCS, 2018 WL 1410860 (Del. Ch. Mar. 21, 2018). But the exhibits to Plaintiffs' complaint and the Lightfoot report show that LICOA's "compensation committee" consists of directors who are *not* officers, so the reasoning of *Ravenswood* does not apply. (Doc. 64-1 at 23; doc. 54-5). And contrary to Plaintiffs' claims that officer salaries increase even when LICOA profits are down, officer salaries *decreased* in 2020 in conjunction with LICOA's declining profits. (Doc. 64-1 at 16). So the court finds no cause for concern as to Lightfoot's investigation of officer compensation.

The court also respects Lightfoot's investigation into the allegedly "lavish" incentive trips extended to directors. The report found that these trips serve a business function by rewarding salespeople who qualify under company guidelines as high-performing sales agents. (Doc. 64-1 at 14, 23). At one point, LICOA asked its agents whether it should replace the trips with increased commission for agents; the agents "overwhelmingly" rejected the offer. (Doc. 64-1 at 19). And another interviewee recalled the pride and motivation she felt when her husband qualified to go on the trips as an agent. (Doc. 64-1 at 20). Further, several witnesses attested that having the directors on the trips also serves a business interest by helping the directors to build rapport with agents, to instill in agents their value to the company, and to build the directors' familiarity with LICOA's sales force. (Doc. 64-1 at 19–21, 23). They also stated that companies

in the insurance industry commonly offer reward trips of this sort. (Doc. 64-1 at 17). In other words, the report's findings rebut Plaintiffs' argument that the value of the incentive trips is "implausible." (Doc. 65 at 22). So the court respects Lightfoot's finding that the trips—and the Directors' presence on those trips—serve an important business interest.

Finally, Plaintiffs' waste claim includes allegations that the Directors who are also officers received "lavish offices," such as Plaintiffs' documentary evidence that LICOA purchased a $4,787 office chair for Clarence Daugette. (Doc. 54 at 18; doc. 54-6). Lightfoot found that LICOA recently conducted a comprehensive renovation of its offices and buildings, some of which are over 100 years old. (Doc. 64-1 at 23). Lightfoot specifically investigated "non-salary reimbursements" for Daugette and others. (Doc. 64-1 at 25). Based on documents uncovered in the investigation, Lightfoot created a line-item account of the Directors' office expenses; Lightfoot found no record of such lavish items, including Daugette's alleged chair. Lightfoot found that the office expenses uncovered "were modest and supported by receipts or[] other appropriate documentation." (Doc. 64-1 at 28). The court respects Lightfoot's investigation as to this issue.

### v. Demand-Rejection Conclusion

In sum, the court finds that the Lightfoot report sufficiently addresses "every paragraph and allegation of misconduct" in Plaintiffs' Third Amended Consolidated Complaint. *See Deal*, 991 F.3d at 1321. Lightfoot adequately provided all information reasonably available, such that Smith and Cobb could make their recommendation based on a good faith and thorough investigation. *See Roberts*, 404 So. 2d at 632. Defendants may well have engaged in the wrongs that Plaintiffs allege. But in recommending rejection of Plaintiffs' claims, Smith and Cobb were not "authorizing or condoning the alleged wrongful acts." *See id.* Rather, they were simply

recommending that *pursuing litigation* as to those wrongs was not "in the company's best interests." *See id*. In the final pages of the report, Lightfoot weighed the pros and cons of pursuing Plaintiffs' claims, finding that most of the claims concerned matters long since passed, wrongs more efficiently corrected outside of litigation, or allegations that lacked factual basis. (Doc. 64-1 at 26). After assessing Smith and Cobb's "process" rather than their "correctness," the court finds that process, which relied on Lightfoot's report, reflects a good faith and thorough investigation. *See Deal*, 991 F.3d at 1321.

So the court finds that Smith and Cobb properly relied on Lightfoot's investigation in recommending that the board reject Plaintiffs' claims. Under *Roberts* and the business judgment rule, the court respects the LICOA Board's decision to reject Plaintiffs' claims based on that recommendation. The court will dismiss with prejudice Plaintiffs' derivative claims (Counts One, Four, Five, and Six).

### e.  The Statute of Limitations as to Plaintiffs' Derivative Claims

LICOA alternatively argues that the court should dismiss Plaintiffs' derivative claims arising before August 28, 2017 because the statute of limitations prohibits such claims. (Doc. 57 at 22 *et seq.*). The court agrees.

A two-year statute of limitations applies to Plaintiffs' derivative claims. *See* Ala. Code § 6–2–38(l); *DGB, LLC v. Hinds*, 55 So. 3d 218, 224 (Ala. 2010). So absent any tolling provision, the statute of limitations bars Plaintiffs' claims arising from harms occurring two years prior to the filing of Plaintiffs' original complaint on August 28, 2019.

As an initial matter, Plaintiffs argue that they need not defend the timeliness of their claims because Plaintiffs "are not required to plead that their claims are not barred by limitations." (Doc. 65 at 34). Plaintiffs' double negatives reflect this area of law, in which the

Eleventh Circuit has held that a statute of limitations bar is "an affirmative defense, and plaintiffs are not required to negate an affirmative defense in their complaint." *La Grasta v. First Union Securities, Inc.*, 358 F.3d 840, 845 (11th Cir. 2004) (citations omitted). But the inverse of this proposition is that the plaintiff must *rebut* timeliness challenges "if it is apparent from the face of the complaint that the claim is time-barred." *Id.*

Here, Plaintiffs' complaint provides dates showing that much of its factual bases occur outside the two year statute of limitations, including nepotistic practices in the early 2000s; a Department of Insurance report from 2005; wrongly expensed personal items as reported in 2012, 2014, and 2017 internal audits; excessively lavish director vacations as evidenced in 2013 social media posts; failure to fully consider stock buybacks evidenced in 2015 board meeting minutes; a witness account of directors working short hours in 2016; and a decades-old scheme of directors' stock purchases at below book values. Also, Plaintiffs *affirmatively pled* tolling defenses in their complaint to fend off statute of limitations challenges. (Doc. 54 at 49 *et seq.*). So the court finds that it *is* "apparent from the face of the complaint" that some of Plaintiffs' claims are time-barred. *See La Grasta*, 358 F.3d at 845. The court now examines whether any tolling provisions save Plaintiffs' time-barred claims.

i.     **The Savings Clause of Ala. Code § 6–2–3.**

Plaintiffs pled and now argue that the savings provision found in Alabama Code § 6–2–3 preserves their untimely claims. (Doc. 65 at 32).

Section 6–2–3 provides that a plaintiff's claim "must not be considered as having accrued until the discovery by the aggrieved party of the fact constituting the fraud, after which he must have two years within which to prosecute his action." Ala. Code § 6–2–3. Alabama courts have found that § 6–2–3 applies to fiduciary duty claims and "other torts," so long as the Plaintiff

alleges "a fraudulent concealment of the existence of a cause of action." *DGB, LLC v. Hinds*, 55 So. 3d 218, 224 (Ala. 2010) (quoting *Holdbrooks v. Central Bank of Ala., N.A.*, 435 So. 2d 1250, 1251 (Ala. 1983)).  The party seeking shelter under § 6–2–3 bears the burden of showing that his claims fall within it. *See DGB, LLC*, 55 So. 2d at 226.

To meet that burden, the plaintiff must allege

1) the time and circumstances of the investors' discovery of their causes of action, 2) the facts of circumstances by which the defendants concealed the investors' causes of action or injury, and 3) what prevented the investors from discovering the facts surrounding their injury.

*DGB, LLC*, 55 So. 3d at 227.

Here, the court finds that Plaintiffs fail to allege the second and third elements that *DGB* requires. Plaintiffs allege that they did not discover their cause of action until the May 2018 meeting between Colin Peterson and Clarence Daugette. (Doc. 65 at 32). As to the second element, Plaintiffs only argue that Defendants concealed their *share purchases* "by using family members for purchases" and "kept no record of *buy-out proposals*." (Doc. 65 at 32). But this argument does nothing to defend Plaintiffs' other untimely claims, which involve executive compensation, lavish vacations, prohibited corporate expenses, and other wasteful practices going back decades.

More importantly, and to the third element, Plaintiffs have not shown that Defendants "prevented" them from uncovering their causes of action. *See DGB, LLC*, 55 So. 2d at 227. Plaintiffs allege that Clarence Daugette openly admitted to his family-share-purchase scheme in the May 2018 meeting with Colin Peterson. (Doc. 54 at 11). And the factual bases for the waste claims were reported in the Department of Insurance report of the early 2000s, in LICOA's internal audits in the 2010s, and in executives' Instagram posts from 2013. Also, exhibits to Plaintiffs' complaint show that Defendants handed over records of stock sales without

concealing the sale price. *See* (doc. 54-10, record of Daugette's stock purchases in 2020). The availability of these facts contrasts with cases where the factual basis for the cause of action was "entirely under the control of the defendants" and where "the defendants concealed and otherwise prevented" plaintiffs from uncovering the wrongs. *See DGB, LLC*, 55 So. 3d at 227. The court finds no allegations of any effort by Defendants to conceal the causes of action. So, the court finds that Plaintiffs have not met their burden of showing that their claims fall within § 6–2–3's savings provision.

### ii.     Equitable Tolling

Next, Plaintiffs claim that the "equitable tolling doctrine" saves their untimely claims. (Doc. 65 at 34). Plaintiffs appear to argue for the equitable tolling doctrine based on their perception that the savings provision of § 6–2–3 applies only to their fraud claims and not to their breach of fiduciary duty claims. (Doc. 65 at 35). If so, Plaintiffs are incorrect. In *DGB*, the Alabama Supreme Court held, "Because § 6–2–3 applies to the fraudulent concealment of the existence of a cause of action, if the investors have sufficiently alleged the fraudulent concealment of their claims, § 6–2–3 may apply *even to their non-fraud claims*." *DGB, LLC*, 55 So. 3d at 225–26 (citations omitted and emphasis added). Thus, the court cannot discern how the equitable tolling doctrine could benefit Plaintiffs in a way that § 6–2–3 could not.

In any case, Plaintiffs' claims fail to trigger the historic equitable tolling doctrine for the same reason they fail to trigger § 6–2–3: they do not show that Defendants were "responsible for the *concealment* of facts upon which a claim could be based." *See Jefferson Cnty. Truck Growers Ass'n v. Tanner*, 341 So. 2d 485, 488 (Ala. 1977) (emphasis added). As discussed above, Plaintiffs could uncover much of the factual basis for their claims from the Department of Insurance audit of the early 2000s and company audits and other sources in the 2010s. Further,

the fact of Daugette's open disclosure in the May 2018 meeting, which occurred within the statute of limitations period, belies any effort by Defendants to conceal the facts underlying Plaintiffs' cause of action. The court finds that Plaintiffs failed to allege facts showing that Defendants prevented Plaintiffs from discovering their cause of action.

Also, the Plaintiffs may not rely on equitable tolling after facts come to light "sufficient to provoke inquiry in reasonable minds which would have led to the facts on which the claim is based." *See Jefferson Cnty. Truck Growers Ass'n*, 341 So. 2d at 488. The court finds that a reasonable plaintiff would have uncovered the facts alleged when audits and documents from the 2000s and 2010s first publicly exposed them. For these reasons, the equitable tolling doctrine does not save Plaintiffs' time-barred claims.

### iii.   The Continuing Tort Doctrine

Plaintiffs also pled and now argue that the continuing tort doctrine saves their claims because they "complain of ongoing and systematic conduct by Defendants." (Doc. 65 at 33). Under Alabama law, a "continuous tort" occurs when "the repeated actions of the defendants combined to create a single cause of action in tort." *Moon v. Harco Drugs, Inc.*, 435 So. 2d 218, 220 (Ala. 1983). But in *Moon*, the Alabama Supreme Court limited the continuing tort doctrine to these situations:

> (1) when an employer exposes its employee on a continuing basis to harmful substances and conditions; (2) when there is a single sustained method pursued in executing one general scheme, as in a blasting case; and (3) when a plaintiff landowner seeks damages for the contamination of a well or stream.

*Moon*, 435 So. 2d at 220–21.

Plaintiffs' claims do not fall into the categories enumerated in *Moon*. Most cases relying on *Moon* concern toxic torts under categories one and three; Plaintiffs allege no such harm here. And Plaintiffs' fiduciary claims are a far cry from a "blasting case" under *Moon*'s category two.

45

Plaintiffs vaguely defend their pleadings as identifying "an ongoing pattern of conduct occurring consistently over years." (Doc. 65 at 43). But the only "consistent" practices the court identifies are Defendants' share purchases and the director perks. And Plaintiffs have not alleged any series of purchases or perks that would amount to a "general scheme," besides Daugette's 2020 purchases, which are not time-barred anyway.

The court could locate only one albeit unpublished business tort case where a court applied the continuing tort doctrine. *See Stuart Lubricants & Serv. Co., Inc. v. Castrol Indus. N.A., Inc.*, No. 2:00-CV-2845-VEH, 2006 WL 8437681 (N.D. Ala. May 23, 2006) (applying Alabama law). There, the plaintiff claimed that the defendant tortiously interfered with a business relationship. *Id.* at *7. The defendant allegedly made repeated misrepresentations to the plaintiff's business partner at a series of solicitation meetings. Given the connected nature of these alleged misrepresentations, the court applied the continuing tort doctrine.

Repeated and similar efforts to divert business from a *single* business relationship may trigger the continuing tort doctrine, as in *Stuart Lubricants*. But here, Plaintiffs have alleged disjointed harms for conduct including Defendants' compensation decisions, capital allocation, executive expenses and vacations, and separate stock purchases by separate directors from separate sellers. The disparate nature of those transactions does not align with the scope of the continuing tort doctrine. *See Hosea v. Langley*, No. Civ.A. 04-0605-WS-C, 2006 WL 314454, at *17 (N.D. Ala. Feb. 8, 2006) ("Rather than being a case of repetitive acts or ongoing wrongdoing causing continuous, cumulative injury, this is a case in which defendants are accused of discrete misdeeds causing discrete injuries."). So, the continuing tort doctrine—even if it applied to shareholder derivative claims—does not save Plaintiffs' claims.

In sum, the court finds that Plaintiffs fail to meet their burden of showing that a tolling

provision applies to the two-year statute of limitation over Plaintiffs' derivative claims. So if the court were not dismissing all of Plaintiffs' derivative claims based on the board's business judgment in rejecting those claims, the court would dismiss Plaintiffs' derivative claims that arise from facts occurring earlier than August 28, 2017—two years prior to Plaintiffs' complaint.

**II.**     **Plaintiffs' Direct Claims**

In their individual capacity, Plaintiffs directly seek LICOA's dissolution (Count Two), and they seek a statutory penalty for LICOA's violation of their rights by failing to provide records for shareholder inspection (Count Three). Defendants move to dismiss both of these claims, arguing that the state court where LICOA's principal office is located—that is, the Circuit Court of Etowah County—has exclusive jurisdiction. The court disagrees and will address this challenge first. As to the dissolution claim, Defendants also argue that this court lacks equity power over the claim and that the court should abstain from exercising jurisdiction under the authority of *Pennsylvania v. Williams*, 294 U.S. 176 (1935). Again, the court disagrees.

   ***a.   Whether the Circuit Court of Etowah County Has Exclusive Jurisdiction Over the Direct Claims***

Defendants argue that Alabama's dissolution and shareholder inspection statutes vest "exclusive jurisdiction" over Plaintiffs' direct claims in the state court of LICOA's principal place of business, which is Etowah County. (Doc. 57 at 35).

Alabama's dissolution statute provides: "The circuit court for the county in which the corporation's principal office is located in this state . . . *may dissolve a corporation* . . . in a proceeding by a stockholder." Ala. Code § 10A–2A–14.10(a)(2) (emphasis added). And under Alabama's shareholder inspection statute, a corporation that denies a shareholder the right to inspect its records is liable to the shareholder for a penalty of up to ten percent of the value of the shareholder's stocks. Ala. Code § 10A–2A–16.02(d)(2). Unlike the dissolution statute, § 16.02

does not identify the appropriate state court in which to pursue the inspection penalty.

As an initial matter, Defendants argue that the court should read § 16.02 (the inspection penalty provision) "in conjunction with its sister statute, § 16.04." (Doc. 57 at 39). Section 16.04 states that, when a corporation denies a shareholder the right to inspect its records, the court of the corporation's principal office "*may* summarily order *inspection* and copying of the records demanded." Ala. Code § 10A–2A–16.04(a) (emphasis added). But here, Plaintiffs seek the *penalties* resulting from LICOA's alleged failure to provide records—not a court order compelling *inspection* of the records. So § 16.02—not § 16.04—applies to Plaintiffs' claim.

As to the substance of Defendants' challenge, the Supreme Court long ago held: "Whenever a general rule as to property or personal rights, or injuries to either, is established by State legislation, its enforcement by a Federal court in a case between proper parties is a matter of course, and the jurisdiction of the court, in such case, is not subject to State limitation." *Chicago & N.W. Ry. Co. v. Whitton's Admin.*, 80 U.S. 270, 286 (1872).

Accordingly, the federal district courts generally agree that state dissolution statutes cannot divest federal courts of their jurisdiction. *See Belcher v. Birmingham Trust Nat'l Bank*, 348 F. Supp. 61, 148 (N.D. Ala. 1968) (finding that Alabama's dissolution statute "extended the *jurisdiction* of the [federal district] court to liquidate and dissolve a corporation") (emphasis in original); *Hershewe v. Givens*, No. 1:14-cv-655-MHT, 2015 WL 5829887, *10 (M.D. Ala. Sep. 29, 2015) (interpreting Alabama's LLC dissolution statute and finding, "a state legislature cannot avoid federal-court jurisdiction simply by enacting a statute that requires the case be brought in state court"); *see also Codos v. Nat'l Diagnostic Corp.*, 711 F. Supp. 75, 77 (E.D.N.Y. 1989) (finding that New York dissolution statute had "no power to expand or contract federal diversity jurisdiction."); *Alkire v. Interstate Theaters Corp.*, 379 F. Supp. 1210, 1213 n.7 (D. Mass. 1974)

("The statute vests jurisdiction for a petition to dissolve a corporation only in the state's highest court, but limited state jurisdiction does not by itself defeat federal diversity jurisdiction.").

Defendants respond with cases finding that shareholder inspection statutes *can* divest federal jurisdiction. But these cases all interpreted Delaware law, which provides that "the Court of Chancery is hereby vested with *exclusive jurisdiction* to determine whether or not the person seeking inspection is entitled to the inspection sought." *See Transeo S.A.R.L. v. Bessemer Venture Partners VI L.P.*, 936 F. Supp. 2d 376, 403 (S.D.N.Y. 2013) (emphasis added); *Reserve Solutions, Inc. v. Vernaglia*, 438 F. Supp. 2d 280, 289 (S.D.N.Y. 2006). And the shareholder plaintiffs in those cases sought a court order compelling inspection of the documents withheld—not a statutory penalty, as here. So, those cases, which at best provide merely persuasive authority, lack any persuasive weight because they interpreted statutory language distinguishable from Alabama's.

The court finds that it has jurisdiction to hear Plaintiffs' direct claims. Supreme Court and federal district court precedent, including those applying Alabama law, agree that a state statute typically may not divest federal courts of their jurisdiction over claims between parties meeting the diversity jurisdiction requirements. *See, e.g.*, *Chicago & N.W. Ry. Co.*, 80 U.S. at 286; *Belcher*, 348 F. Supp. at 148. And Alabama's statutes, which provide that Alabama's circuit courts "may" dissolve a corporation and oversee shareholder inspections claims, lack the concrete "exclusive jurisdiction" language present in Defendants' contrary authority. *Compare* Ala. Code § 10A–2A–14.10(a) *with Transeo S.A.R.L.*, 936 F. Supp. 2d at 403. So the court finds that it has jurisdiction over Plaintiffs' dissolution and inspection claims based on diversity jurisdiction.[6]

---

[6] Plaintiffs' complaint reflects that complete diversity of citizenship exists between the parties (Doc. 54 at 3), and Defendants have not challenged the court's subject matter jurisdiction on that basis.

Because the applicable statutory language does not divest federal courts of jurisdiction over the direct claims, the court will deny Defendants' motion to dismiss on this ground.

### b.  Plaintiffs' Dissolution Claim

Defendants level additional procedural challenges against Plaintiffs' dissolution claim. (Doc. 57 at 34, *et seq.*). They argue that the court lacks equity power to dissolve a corporation and that the court should abstain from deciding the claim under *Pennsylvania v. Williams*, 294 U.S. 176 (1935). The court disagrees.

### i.   Whether the Court Has Equity Power Over the Dissolution Claim

Defendants argue that this court lacks equity power based on two nonbinding cases. In *Alkire v. Interstate Theaters Corp.*, the Massachusetts District Court found that it lacked the equitable power to dissolve a state corporation under that state's dissolution statute. 379 F. Supp. 1210, 1214 (D. Mass. 1974). The court first reasoned that the statute's language created a "narrow mandate" that limited the equity power over such proceedings. *See* Mass. Gen. L. 156B § 99 (providing that dissolution suits "may be filed in the supreme judicial court"). The court then relied on several state cases "standing for the proposition that, *absent fraud or mismanagement*, a court of equity has no inherent power to dissolve a corporation." *Alkire*, 379 F. Supp. at 1213 (emphasis added). Finally, the court found that "the inherent equity powers of a federal court are those which were administered by the English Court of Chancery in 1789." *Id.* at 1214 (citing *Atlas Life Ins. Co v. W.I. Southern, Inc.*, 306 U.S. 563, 568 (1939)). The court concluded that it did not possess the power of corporate dissolution because no "precise historical analogue to a decree of corporate dissolution existed in the English Court of Chancery." *Id.* Defendants' other cited case adopted the reasoning of *Alkire* almost entirely. *See Codos v. Nat'l Diagnostic Corp.*, 711 F. Supp. 75, 78 (E.D.N.Y. 1989) (interpreting New York

law).

This court finds little persuasive value to *Alkire*'s reasoning concerning the English Court of Chancery's equitable powers in 1789. Another court refuted this view in addressing its equity powers under Delaware's dissolution statute. *In re English Seafood (USA), Inc.*, 743 F. Supp. 281, 287 (D. Del. 1990). The court in *English Seafood* found that the doctrine set forth in *Erie R.R. Co. v. Tompkins*, 304 U.S. 64 (1938), and its progeny granted to the federal courts "a uniform basis for granting equitable remedies in cases in which substantive rights have arisen under state law." *Id.* at 288 (quoting *Black & Yates, Inc. v. Mahogany Ass'n*, 129 F.2d 227, 233 (3d Cir. 1941)). The court concluded that Delaware's corporation law created substantive shareholder rights, both in the corporation's creation and in its dissolution. *Id.* at 288. So, the court in *English Seafood* found that it possessed power to act in equity under Delaware's statute providing for corporate dissolution. *Id.* (citing *Moran v. Edson*, 493 F.2d 400 (3d Cir. 1974)). Notably, the court in *Alkire* failed to analyze the *Erie* doctrine's mandate that federal courts adjudicate state-created substantive rights.

The court agrees with the reasoning of *English Seafood*; like Delaware's dissolution statute, Alabama's dissolution statute creates substantive rights for shareholders both in the corporation's existence and in its dissolution if "illegal, oppressive, or fraudulent" director conduct occurs. *See* Ala. Code § 10A–2A–14.10(a)(2)(ii). The *Erie* doctrine instructs that this court must adjudicate Plaintiffs' substantive rights under Alabama's dissolution statute.

Also, the Supreme Court long ago ruled that a plaintiff suing for "liquidation of [the defendant's] business" under state statute sought "relief which a federal court of equity is competent to give." *Pennsylvania v. Williams*, 294 U.S. 176, 181 (1935). Accordingly, another judge in this court has exercised the court's equity power to dissolve a corporation under

Alabama's dissolution statute. *See Belcher*, 348 F. Supp. at 152 (Grooms, J.). The court in

*Belcher* construed the issue to be whether it had "jurisdiction" over the dissolution claim; the

court found that it did. Specifically, Judge Grooms found that the Alabama dissolution statute

"extended the *jurisdiction* of the court to liquidate and dissolve a corporation. Guided by

equitable considerations and the applicable principles of law, the ultimate decision remains one

for the trial court based upon the particular facts of each case." *Id.* at 148. And in a case that

predated Alabama's dissolution statute, another judge on this court stated that the court had

"jurisdiction" to preside over common law dissolution claims if the plaintiff made allegations of

"fraud, collusion, mismanagement, abuse of trust, waste, etc. clearly giving the court jurisdiction

because of *the presence of a typical, traditional suit in equity*." *Am. Fabrics Co. v. Couturier*, 65

F. Supp. 563, 564–65 (N.D. Ala. 1946) (Mullins, J.) (emphasis added).

Although *American Fabrics* and *Belcher* purported to analyze the court's "jurisdiction,"

their conclusions have weight here because they explicitly addressed the extent of the federal

court's equitable powers over dissolution claims both in Alabama's common law period and in

the period of statutory dissolution. And both cases determined that federal courts can handle

dissolution claims when "equitable considerations" such as allegations of fraud and

mismanagement exist. *See Belcher*, 348 F. Supp. at 148.

Neither Defendants nor their cited authority rebut the Supreme Court's ruling in *Williams*

or the other cases cited above. And unlike the Massachusetts law addressed in *Alkire*, Alabama

law does not create a "narrow mandate" for limited equity powers over dissolution. *Cf. Alkire*,

379 F. Supp. at 1213 *with* Ala. Code § 10A–2A–14.10(a)(2). Rather, Alabama courts have long

stated: "A court of equity may . . . decree a dissolution of the partnership . . . founded upon the

misconduct, or fraud, or violation of duty, of one partner." *See Fogg v. Johnston*, 27 Ala. 432,

437 (Ala. 1855). Further, the court in *Alkire* tacitly admitted what federal courts in this state have consistently found—that federal courts have equitable power to order corporate dissolution when, as here, plaintiffs allege "fraud or mismanagement." *Compare Alkire*, 379 F. Supp. at 1213 *with Belcher*, 348 F. Supp. at 148. Here, Plaintiffs' dissolution claim rests on fraud and mismanagement allegations, which support a finding of this court's equitable power over the dissolution claim.

So the court concludes that it has equity power over Plaintiffs' dissolution claim because Alabama law provides a broad mandate for courts of equity to dissolve corporations and because Alabama's dissolution statute creates a substantive right that this court must adjudicate. The court will deny Defendants' motion to dismiss Plaintiffs' dissolution claim on this ground.

### ii.   Whether the Court Should Abstain Under *Pennsylvania v. Williams*

As explained above, the Supreme Court in *Pennsylvania v. Williams*, 294 U.S. 176 (1935), ruled that federal courts have the *equitable power* to preside over liquidation claims, but the Court also ruled that the lower court should have *abstained from exercising jurisdiction* over the plaintiff's liquidation claim. Accordingly, Defendants argue that this court should abstain from exercising jurisdiction over Plaintiffs' dissolution claim. The court disagrees.[7]

At the outset, the court heeds the Eleventh Circuit's recent reminder that district courts bear a "virtually unflagging obligation to exercise jurisdiction." *See Deal*, 991 F.3d at 1327; *see also Colo. River Water Conserv. Dist. v. United States*, 424 U.S. 800, 813 (1976) ("[A]bstention . . . is the exception, not the rule.").

---

[7] The court acknowledges that its prior opinion found in *Williams* an independent reason for abstaining from exercising jurisdiction over Plaintiffs' dissolution claim. (Doc. 49 at 31). But the court later withdrew that portion of the opinion, and the briefing on this motion is the first time the parties have fully addressed *Williams*. Also, although the Eleventh Circuit's recent decision in *Deal v. Tugalo Gas* primarily addressed *Burford* abstention, the court finds that that case also addresses the policy concerns underlying *Williams* abstention. *Deal*, 991 F.3d 1313. So the court now turns its full attention to *Williams*.

And a thorough review of *Williams* shows that its abstention principle does not apply to this case. In *Williams*, a private bank's shareholder sued in federal court to liquidate the bank under Pennsylvania common law. 294 U.S. at 178. Soon afterward, the state's secretary of banking petitioned to intervene in the case, seeking to conduct the bank's liquidation in accordance with a Pennsylvania statute. The federal court denied the secretary's petition and appointed receivers to conduct the bank's liquidation according to the plaintiff's claim. The Supreme Court reversed.

In a lengthy footnote, the Supreme Court explained Pennsylvania's statutory scheme authorizing the secretary of banking to liquidate banks in a manner resembling modern bankruptcy. *Williams*, 294 U.S. at 182 n.1. The law permitted the secretary to take possession of an insolvent bank's assets under judicial review. The secretary could then take inventory of the bank's assets, handle the claims of its creditors, suspend its business, and liquidate its assets. The Pennsylvania statute specifically granted to the secretary "the status and powers of a receiver of a court of equity," including the power to issue orders enforceable in court. *Id.*

The Supreme Court found that the District Court should have refrained from exercising jurisdiction over the plaintiff's claims in light of Pennsylvania's "complete, comprehensive, and economical scheme" for secretary-conducted liquidation. *Id.* at 179. The Supreme Court found that abstention was proper because "the state officer, charged by the statutes of the state" with the authority to liquidate banks had attempted to intervene. *Id.* at 184. The Supreme Court noted the "accepted" federal court practice of abstaining when exercising jurisdiction "would involve control of or interference with the internal affairs of a domestic corporation of the state." *Id.* at 185. But in the next sentence of the opinion, the Supreme Court stated that a "stronger reason" for abstention was the lower court's "unnecessary interference by injunction with the lawful

54

action of state officers." *Id.*

As explained above, the Supreme Court in *Williams* noted the "accepted" federal practice of abstaining from adjudicating claims that would interfere with the internal affairs of a corporation. *Williams*, 294 U.S. at 185. And based only on that single sentence from the *Williams* opinion, at least two courts have interpreted *Williams* to mandate abstention over state dissolution claims. *See Neary v. Miltronics Mfg. Services, Inc.*, 534 F. Supp. 2d 227 (D.N.H. 2008) (quoting *Williams*); *In re English Seafood (USA) Inc.*, 743 F. Supp. at 289 (same). But the analysis in those cases failed to account for the very next sentence of *Williams*'s reasoning, which identified the Supreme Court's "stronger reason" for abstention: the lower court's "unnecessary interference by injunction with the lawful action of state officers." *See Williams*, 294 U.S. at 185. Nor do they account for the *pages* of the *Williams* opinion explaining how the lower court's exercise of jurisdiction interfered with Pennsylvania's "complete, comprehensive" liquidation statute and the Secretary of Banking's statutorily assigned role in liquidations. *See id.* at 179, *et seq*. So, this court finds unpersuasive the reasoning of *Neary* and *English Seafood*.

Reading *Williams* as a whole, this court interprets *Williams*'s holding as resting on the comprehensiveness of Pennsylvania's dissolution statute and the lower court's preventing the Secretary from intervening—facts that are not present here and were not present in *Neary* or *English Seafood*. As the Supreme Court later reiterated, *Williams* abstention applies when the federal court's jurisdiction would "restrai[n] the exercise of authority vested in state officers." *Colo. River Water Conserv. Dist.*, 424 U.S. at 816. At least one other federal court has agreed that, in the dissolution context, *Williams* abstention turns on whether the court's exercise of jurisdiction interferes with state action. *See Smith v. Aeolian Co.*, 53 F. Supp. 636, 639 (D. Conn. 1943) (declining to abstain from adjudicating dissolution claims under *Williams* because

Connecticut's dissolution statute did not involve "agencies of the state").

Here, Plaintiffs' dissolution claim does not implicate *Williams* abstention because this court's exercising jurisdiction over that claim presents no "unnecessary interference" with the action of state officers. *See Williams*, 294 U.S. at 185. Unlike in *Williams*, this court is not preventing any state officials from intervening in this case to conduct LICOA's dissolution. Nor does Alabama's dissolution statute grant broad power over corporate dissolution exclusively to state agents, as in *Williams*. *Cf. Williams*, 294 U.S. at 179 *with* Ala. Code § 10A–2A–14.01 *et seq*. Multiple entities can seek dissolution in Alabama—the corporation itself, its incorporators, its directors, its shareholders, its creditors, and the Attorney General. *See* Ala. Code § 10A–2A–14.10. But the statute grants none of those entities authority to take control of the corporation's assets, make decisions about its liquidation, or gain "the status and powers of a receiver of a court of equity," as did the Secretary of Banking of Pennsylvania. *See Williams*, 294 U.S. at 182 n.1. And finally, Alabama's dissolution statute is not custom fit to a particular type of corporation, such as a bank or life insurance company; the statute applies to all corporations equally.

Simply put, *Williams* abstention does not apply because Alabama's dissolution statute grants no special authority to state actors and no state actors are seeking to intervene in this case. The court will deny Defendants' motion to dismiss the dissolution claim on abstention grounds because the court finds *Williams* inapplicable to this case.

## CONCLUSION

For the reasons explained above, the court will enter an order contemporaneously with this opinion ruling as follows. The court will grant in part and deny in part Defendants' motion to dismiss. As to the derivative claims, the court will dismiss all Plaintiffs' derivative claims with

prejudice because LICOA's independent directors validly exercised their business judgment in rejecting Plaintiffs' claims after a thorough and good faith investigation. *See Roberts*, 404 So. 2d at 632. If the court were not dismissing the derivative claims on that ground, the court would alternatively dismiss with prejudice any of Plaintiffs' derivative claims arising from facts occurring before August 28, 2017—two years before the filing of Plaintiffs' complaint—because the statute of limitations as to those claims has expired.

But the court will deny Defendants' motion to dismiss Plaintiffs' individual direct claims because the court finds no merit to Defendants' challenges to those claims.

So the only claims remaining in the case are the direct claim for dissolution, brought by all Plaintiffs against all Defendants (Count 2) and the direct claim for violation of shareholder rights, brought by Plaintiffs Trondheim and MTP against all Defendants (Count 3).

**DONE** and **ORDERED** this 25th day of March, 2022.

**KARON OWEN BOWDRE**
UNITED STATES DISTRICT JUDGE